[Cite as *In re D.H.*, 2021-Ohio-3821.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE D.H.                      :

Minor Child             :

[Appeal by Mother]      :

:

:

No. 110505

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 28, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-18915592

---

### *Appearances:*

Dean M. Valore, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

KATHLEEN ANN KEOUGH, P.J.:

{¶ 1} Appellant-mother ("Mother") appeals from the judgment of the Cuyahoga County Common Pleas Court, Juvenile Division, granting permanent custody of her minor child, D.H., to appellee, the Cuyahoga County Department of Children and Family Services ("CCDCFS" or the "agency"). For the reasons that follow, we affirm.

## I. Background

{¶ 2} The record reflects that the events leading to this case occurred on December 21, 2018, when Mother became intoxicated at a bar, got into a physical altercation with her boyfriend, and failed to pick up D.H. and his sibling at daycare. No sober caregiver was available to care for the children. The police were called, the children were removed from Mother's care, and she was charged with child endangerment in Parma Municipal Court.

{¶ 3} On December 24, 2018, CCDCFS filed a complaint in the juvenile court alleging that D.H. was neglected and requesting predispositional temporary custody. After a hearing, the trial court granted the request for predispositional temporary custody to CCDCFS. At a subsequent hearing, Mother admitted the allegations of the amended complaint, and D.H. was adjudicated neglected and committed to the temporary custody of CCDCFS. A case plan was developed that included mental health and substance abuse services for Mother, with the goal of reunification with D.H.

{¶ 4} In November 2019, CCDCFS filed a motion to extend the temporary custody order, which the trial court granted. Thereafter, the agency continued to work with Mother to complete her case plan. On October 30, 2020, due to a lack of progress toward reunification, CCDCFS filed a motion to modify temporary custody to permanent custody. Mother later filed a motion for legal custody of D.H.

{¶ 5} The trial court held a trial over two days in March 2021 on the pending motions. Blaine Muehlbauer testified that he is Mother's therapist at Summit

Psychological Associates ("Summit"). He said that he first met Mother in October 2019 and that she had been diagnosed with "an adjustment disorder with anxiety, opiate dependence in remission, cannabis use in remission, and borderline personality disorder."[1] Muehlbauer said that Mother's treatment program was individual therapy sessions every other week. He said that Mother attended from October 2019 until February 2020, when she stopped attending. Muehlbauer said that Mother contacted him again in June 2020 after being encouraged by CCDCFS to reengage in services. She had another six-week lapse in her treatment in the fall of 2020 but returned again after that lapse.

{¶ 6} Muehlbauer said that he tried to focus the counseling sessions on what behavior Mother needed to change in order to get her children back, but Mother was always "externally focused" about her frustrations with CCDCFS and the court system and contended that "everyone was against her." He said she refused to discuss any faults or shortcomings that she might have and chose instead to focus solely on the faults of others. Muehlbauer said that Mother's perception that others were "out to get her" was consistent with her diagnosis of borderline personality disorder. He said that Mother also had a history of emotionally and sexually abusive relationships with men, and those relationships could have contributed to her personality disorder and her inability to trust people. Muehlbauer said that Mother was open to treatment "in the sense of coming in" to

---

[1] Mother was initially referred by CCDCFS to Summit in August 2019 and assigned a female therapist. She was reassigned to Muehlbauer due to conflict with the therapist and her belief that she could better interact with a male therapist.

talk but that the consistent challenge was to "get her to introspect about her role in stuff." He said she had had no real breakthroughs in treatment and seemed to "be kind of stuck" because of her persistent failure to look at her own behavior and consider what part she played in the events of her life. Muehlbauer said that to date "any progress ha[d] been very minimal."

{¶ 7} Muehlbauer said that he did several substance abuse assessments with Mother and she self-reported that she was intoxicated and fighting with her boyfriend when D.H. and his sibling were removed from her care in 2018, and that she had been arrested for driving under the influence in the fall of 2020. He said that Mother told him she was going to AA and "wasn't using," but he acknowledged that he had no independent feedback to verify her statements.

{¶ 8} Constance Olipha, a therapist at Ohio MENTOR, testified that she began working with D.H. in February 2020 while he was at the home of foster parent Lee Hahn. Olipha said that D.H. was diagnosed with oppositional defiant disorder and adjustment disorder. She said that he frequently had temper tantrums and she worked with him to learn how to manage his tantrums and communicate effectively without tantrums. Olipha said that D.H.'s tantrums were "big outbursts" that were "very hard to control," and that he was sometimes physically abusive and threatening to the three other children in the foster home during his tantrums. She testified that D.H. told her that when he had a tantrum at home, his mother would buy him a present if he did not break anything but if he was destructive, he would get "whooped with a belt."

{¶ 9} Olipha said that D.H. visited with Mother every other week, although during the summer of 2020, the visits were virtual due to Covid. She said that D.H.'s tantrums escalated after he resumed in-person visits with Mother and that in October 2020, he told her that he did not want to visit Mother anymore. Olipha said that she had recognized that D.H. was more aggressive and angry for several days after he visited with Mother and had worked with him so he could understand and control his escalated behavior after the visits. She said that when he decided he did not want to visit Mother, he told her, "I'm beginning to see my behaviors are worse after visits."

{¶ 10} Olipha said that in the fall of 2020, D.H. was admitted to Belmont Pines Hospital for one week due to his physically abusive and aggressive behaviors at the foster parent's home, and in January 2021, he was placed at Ohio Guidestone's residential center due to his need for greater structure. She said that she continued to talk to D.H. about once a month after his placement at Ohio Guidestone and he seemed happy and settled there.

{¶ 11} Therapeutic foster parent Lee Hahn testified that D.H. arrived at his home in January 2020, after D.H.'s stepfather said that he could not manage D.H.'s behavior. Hahn said that D.H. had trouble managing his behavior and with damaging property, but when he was not upset, he was "awesome to be around." He testified that when D.H. calmed down after a tantrum, he would expect to get a present because, as he told Hahn, Mother would take him to the store after a

tantrum if he did not break anything. D.H. told Hahn that if his behavior "went too far," however, Mother would whip him with a belt.

{¶ 12} Hahn testified that when D.H.'s visits with Mother stopped due to Covid, D.H. "was doing pretty good." Hahn said that D.H. would "still have a small episode here or there * * * but the violent stuff diminished." Hahn said that when D.H.'s visits with Mother resumed, D.H. would "be crazy" for several days after each visit, "yelling, screaming, throwing things, knocking over cabinetry in the house." Hahn testified that the case manager from Ohio MENTOR was at his house during one of D.H.'s tantrums and became so concerned about his threats to himself and others that she called the police. Hahn said that in September 2020, after D.H. realized that his visits with Mother had an impact on his behavior, he told Hahn that he did not want to visit her. Hahn also testified that one or two days after D.H. moved to Ohio Guidestone, D.H. called him, "crying and frantic." Hahn said that D.H. told him that Mother had called and told him that she was coming to pick him up, but D.H. told Hahn, "I don't want to leave here because I want to come back to your house."

{¶ 13} CCDCFS social worker Emily Mapp testified that the agency became involved in the case in December 2018 after Mother's incident at the bar. Mapp was assigned the case in October 2020.

{¶ 14} She said that paternity for D.H. had been established but Father had not completed any of his case plan goals. She said that Father had last visited D.H. in September 2020 and prior to that, his last visit with D.H. had been in December

2019. Mapp said that Father told her he was not willing to take D.H. but "wished the best" for him.

{¶ 15} Mapp said that Mother's case plan goals were to address her substance abuse and mental health issues. Mother moved to Akron in 2019, and CCDCFS referred her to Summit in Akron for mental health treatment. Mapp said that prior to her move, CCDCFS had referred Mother to a substance treatment facility in Cleveland for an alcohol and other drug ("AOD") assessment. After her move, CCDCFS referred her for an AOD assessment at a facility in Akron. Mapp testified that Mother did not complete either assessment.

{¶ 16} Mapp testified further that in December 2018, CCDCFS arranged for a parenting coach for Mother during her visits with D.H. She testified that the services were stopped because the coach said that she was unable to coach Mother properly given her mental health issues. Mapp said that there was conflict between Mother and the coach because Mother did not believe that she needed the service and was paranoid about her neighbors listening in on the visits.

{¶ 17} Mapp testified that although CCDCFS requested twice-monthly substance abuse screens, Mother was inconsistent with testing. She refused a test in December 2018, so that test was assumed positive; she tested negative in January 2019; and then did not test again until November 2019, when she tested negative. In December 2019, Mother tested positive for cocaine. A drug screen in February 2020 was positive for alcohol. Mother tested negative in March, April, May, June, and July 2020; however, in June 2020, Mother was charged with operating a vehicle

while under the influence. In August 2020, Mother refused to test so the result was presumed positive. Mapp testified that although Mother submitted negative tests from September 2020 through February 2021, she never completed an AOD assessment through the agency and did not complete any substance abuse treatment as required by her case plan. Mapp confirmed that the assessments completed by Muehlbauer were based solely on Mother's self-reporting and that Mother never provided documentation that she was attending AA, despite Mapp's requests that she do so.

{¶ 18} Mapp testified further that Mother did not complete the mental health portion of her case plan because there had been no change of behavior or progress with her counselor. Mapp explained that Mother does not accept responsibility for her behavior and that "everything is everybody else's fault."

{¶ 19} Mapp said that when D.H.'s visits with Mother were suspended during the Covid break, he seemed happier, his behavior was better, and he was making progress with therapy. She said he would also open up to her more. She testified that when the visits resumed, he did not want to talk to her. Mapp said that she supervised D.H.'s in-person visits with Mother and observed that Mother often told him that she was the only person he could trust and "everyone is against [us]." Mapp noted that D.H. refused to visit with Mother in November and December 2020. She said that telephone calls between Mother and D.H. at Ohio Guidestone are now monitored because during the first call, which was unmonitored, Mother told D.H. that she was coming to pick him up, which caused him great distress.

{¶ 20} Mapp said that D.H. had been inconsistent about whether he wanted to be reunited with Mother. In June 2020, after refusing to call Mother for a telephone visit, D.H. told Mapp that he did not want to go back home and wanted to be adopted. In July 2020, he told Mapp that he had bad memories of home and was not sure that he wanted to go back there. Mapp said that a few weeks prior to trial, D.H. told her that he wanted to go back home because Mother would give him presents.

{¶ 21} Mapp testified that permanent custody was in D.H.'s best interest because Mother had not benefitted from her case plan services and the risks that led to his removal from the home had not been eliminated. She said that CCDCFS was concerned about Mother's mental health because she refused to recognize she has any issues and thus had made no progress toward changing her behavior. She said that Mother does not have the coping skills to deal with D.H.'s behavior issues and that CCDCFS did not believe that Mother would be able to stay sober if D.H. were returned to her, putting D.H.'s safety at risk. She testified further that D.H. had been in temporary custody for two years and deserved permanency and a normal home environment.

{¶ 22} D.H.'s guardian ad litem acknowledged that D.H. had been inconsistent about whether he wanted to return to Mother but said that more recently he had stated that he wanted to be reunited with her. He recommended that the court grant legal custody to Mother with protective supervision, although

he acknowledged that he "would be very concerned" if D.H. and Mother were reunited because they both have "issues that need continuing care."

{¶ 23} After consideration, the trial court granted permanent custody of D.H. to the agency. In its journal entry, the court found that D.H. had been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period and that he cannot be placed with either of his parents within a reasonable period of time or should not be placed with either parent. The court further found that an award of permanent custody was in D.H.'s best interest. This appeal followed.

## II. Law and Analysis

{¶ 24} In her single assignment of error, Mother contends that the trial court abused its discretion in committing D.H. to the permanent custody of CCDCFS because its decision is not supported by clear and convincing evidence.

{¶ 25} Termination of parental rights is an alternative of last resort but is sanctioned when necessary for the welfare of a child. *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7. Under a two-prong test set forth in R.C. 2151.414, a trial court may grant permanent custody of a child to an agency if the court determines by clear and convincing evidence that (1) one of the factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies; and (2) an award of permanent custody is in the child's best interest.

{¶ 26} "Clear and convincing evidence" is evidence that "will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be

established." *In re C.B.*, 8th Dist. Cuyahoga No. 92775, 2011-Ohio-5491, ¶ 28, citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof. *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

### A. R.C. 2151.414(B)(1) Factors

{¶ 27} The R.C. 2151.414(B)(1)(a) through (e) factors are: (a) the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent; (b) the child is abandoned; (c) the child is orphaned and no relatives are able to take permanent custody of the child; (d) the child has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period; and (e) the child or another child in the parents' custody has been adjudicated an abused, neglected or dependent child on three separate occasions in any court. Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency. *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 28.

{¶ 28} The trial court found that D.H. had been in the custody of CCDCFS for 12 or more months of a consecutive 22-month period. Mother concedes this finding (Mother's Brief, p. 12), and it is supported by the record. The time period for R.C. 2151.414(B)(1)(d) is calculated from when the child enters custody of the

agency and the filing of the motion for permanent custody. *In re J.C.*, 8th Dist. Cuyahoga No. 106272, 2018-Ohio-2234, ¶ 29, citing *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26. There is no dispute that D.H. entered agency custody on December 24, 2018, and that CCDCFS filed its motion for permanent custody on October 30, 2020. CCDCFS filed its motion a little more than 22 months after D.H. entered temporary custody, and D.H. had been in the agency's temporary custody that entire time. Accordingly, the trial court properly found that R.C. 2151.414(B)(1)(d) applied. When R.C. 2151.414(B)(1)(d) applies, the trial court is not required to make any other finding and can immediately proceed to the best interest determination. *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, ¶ 26, citing *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 18; *J.C.* at *id.*

## B. R.C. 2151.414(D)(1) Best Interest Determination

{¶ 29} When considering the best interest of a child, R.C. 2151.414(D)(1) directs the court to consider all relevant factors, including but not limited to: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers; (b) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (c) the custodial history of the child; (d) the child's need for a legally secured permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7) through (11) apply. Although a trial court is required to consider each

of the R.C. 2151.414(D)(1) factors in making its permanent custody determination, "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

{¶ 30} The trial court's journal entry specifically noted that it had considered all the R.C. 2151.414(D)(1) factors and found that several applied. With respect to D.H.'s wishes, the court noted that it had conducted an in camera hearing with D.H. and obtained his current wishes and that his wishes had been inconsistent during the pendency of the case. Regarding his custodial history, the court found that D.H. had been in the agency's temporary custody for over two years as of the time of trial.

{¶ 31} As to whether D.H.'s need for a legally secure placement could be achieved without a grant of permanent custody, the court found that:

> Child deserves a safe, stable, and consistent/structured environment where all of his needs can be met and he can thrive. This cannot be achieved with Father as he has abandoned the child. This cannot be achieved with Mother as she has failed to successfully complete and/or benefit from her own case plan services. While she is engaged in mental health treatment, she fails to acknowledge her own mental health issues. She has failed to consistently maintain her sobriety. The child has behavioral issues that are currently being addressed in residential treatment. According to the testimony, child's behaviors would escalate after visits with Mother and were more under control when he wasn't visiting with Mother. According to the testimony, upon child's recent placement in residential treatment, Mother told Child she was going to remove him from there.

{¶ 32} Finally, with respect to whether any of the factors set forth in R.C. 2151.414(E)(7) through (11) applied, the court found that R.C. 2151.414(E)(10) and (11) applied: Father had abandoned D.H. and Mother's parental rights with respect to a sibling of D.H. had previously been involuntarily terminated.

{¶ 33} After careful consideration of the testimony presented at the permanent custody hearing, we find there is competent, credible evidence in the record to support the juvenile court's findings under R.C. 2151.414(1) and its determination that permanent custody to the agency was in D.H.'s best interest.

{¶ 34} As set forth above, the trial testimony demonstrated that D.H. had been in the agency's temporary custody from December 2018 until the time of trial in March 2021, well over two years. It further established that Father had abandoned D.H.; he had no contact with him between December 2019 and September 2020, and as of trial in March 2021, he had had no contact with D.H. since September 2020. Further, Father had indicated that he was unwilling to care for D.H. The trial testimony also indicated that D.H.'s wishes regarding whether he wanted to be reunited with Mother were inconsistent. And, as set forth in CCDCFS exhibit No. 5, one of Mother's children had been placed in the legal custody of the child's father due in part to Mother's mental health issues, lack of sobriety, and failure to complete or benefit from services.

{¶ 35} With respect to D.H.'s need for a legally secure placement, the trial testimony established that such could not be accomplished if D.H. were placed with Mother. The evidence demonstrated that Mother did not complete or benefit from her case plan services. Specifically, although she appeared for mental health counseling, she failed to acknowledge her mental health issues and thus made no progress in addressing them. With regard to her substance abuse issues, Mother did not complete an agency AOD assessment, despite two referrals and even though she

admitted to the allegation in the amended complaint that she had a substance abuse problem with alcohol. And although she self-reported to Muehlbauer that she was not using alcohol or other substances, she failed to consistently offer screening tests during much of the case pendency and, in fact, was cited for driving under the influence in June 2020, 18 months after the case began. She also offered no verification that she was attending AA, despite repeated requests that she do so. The evidence clearly refutes Mother's assertion that she had "substantially complied" with her case plan and had "gotten her act together" such that she should be given the opportunity to again parent D.H.

{¶ 36} "A child's best interests require permanency and a safe and secure environment." *In re K.M.*, 8th Dist. Cuyahoga No. 95374, 2011-Ohio-249, ¶ 23. The evidence demonstrated that a safe and secure environment was not possible at Mother's home. As Emily Mapp testified, because Mother failed to consistently maintain her sobriety and address her substance abuse and mental health issues, CCDCFS could not guarantee D.H.'s safety if he were returned to her.

{¶ 37} Finally, the evidence demonstrated that D.H. had significant behavioral issues that, at least as of the time of trial, required intense treatment in a residential facility. It also unequivocally demonstrated that D.H.'s emotional and behavioral issues were exacerbated by contact with Mother, a fact that even eight-year-old D.H. was astute enough to realize.

{¶ 38} We review a trial court's grant of permanent custody for an abuse of discretion. *Masters v. Masters*, 69 Ohio St.3d 83, 85, 630 N.E.2d 665 (1994). When

reviewing the trial court's custody decision, an appellate court must make "'every reasonable presumption in favor of the lower court's judgment and finding of facts.'" *In re J.C.*, 8th Dist. Cuyahoga No. 106272, 2018-Ohio-2234 at ¶ 38, quoting *In re Brodbeck,* 97 Ohio App.3d 652, 659, 647 N.E.2d 240 (3d Dist.1994).

{¶ 39} In light of the evidence discussed above, we find that the trial court did not abuse its discretion in determining that permanent custody of D.H. should be awarded to CCDCFS. The trial court's determination that permanent custody was in D.H.'s best interest is supported by clear and convincing evidence.

{¶ 40} In addition to finding that the best-interest determination under R.C. 2151.414(D)(1) supported a finding that permanent custody was in D.H.'s best interest, the trial court found that permanent custody was mandated for D.H. under R.C. 2151.414(D)(2). R.C. 2151.414(D)(1) and (2) are alternative means of reaching the best-interest determination. *In re G.A.*, 8th Dist. Cuyahoga No. 108932, 2020-Ohio-2949, ¶ 61. Under R.C. 2151.414(D)(2), if the juvenile court makes the four enumerated findings, permanent custody is per se in the child's best interest and the court "shall" commit the child to the permanent custody of the agency. *Id.*

{¶ 41} Because Mother's argument that permanent custody was not in D.H.'s best interest focuses entirely on the best-interest determination made under R.C. 2151.414(D)(1), and because we have determined there was clear and convincing evidence to support the trial court's best-interest determination under that section, we need not consider the trial court's findings under R.C.

2151.414(D)(2). The trial court's judgment is affirmed, and the assignment of error is overruled.

{¶ 42} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, PRESIDING JUDGE

MICHELLE J. SHEEHAN, J., and
EMANUELLA D. GROVES, J., CONCUR