[Cite as *In re S.N.L.*, 2022-Ohio-698.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE S.N.L. | : | |
| | : | No. 110990 |
| A Minor Child | : | |
| | : | |
| [Appeal by D.L., Mother] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 10, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-20-909256

*Appearances:*

Michael E. Stinn, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

MARY J. BOYLE, J.:

{¶ 1} Appellant, D.L. ("Mother"), appeals from the juvenile court order awarding permanent custody of her son, S.N.L., to the Cuyahoga County Division of Children and Family Services ("CCDCFS"). For the reasons set forth below, we affirm.

{¶ 2} On October 28, 2020, CCDCFS filed a complaint in the juvenile court, alleging that S.N.L. (d.o.b. 09/30/2020) was dependent and requesting predispositional temporary custody. The complaint alleges, among other things, that Mother has a substance abuse problem; Mother used drugs and alcohol while pregnant; Mother has a mental condition (schizophrenia) and has failed to address this condition; Mother lacks stable housing and is homeless; Mother and alleged father ("Father") have a physically violent relationship; alleged Father lacks stable housing and is homeless; alleged Father has a substance abuse problem; and alleged Father failed to provide support for the child. After a hearing on November 10, 2020, the juvenile court granted the request for predispositional temporary custody to CCDCFS. S.N.L. was just over one month old at the time.

{¶ 3} At a subsequent hearing, S.N.L. was adjudicated dependent, and following the dispositional hearing, was committed to the temporary custody of CCDCFS. A case plan was developed that included mental health and substance abuse assessment and treatment for Mother and provision for housing and basic needs, with the goal of reunification with S.N.L.

{¶ 4} On June 2, 2021, CCDCFS filed a motion to modify temporary custody to permanent custody. The court held a hearing on the motion on October 6, 2021, at which the following evidence was adduced.

{¶ 5} CCDCFS caseworker Andrea Flynn ("Flynn") testified she was assigned to the case in November 2020. CCDCFS received a referral from the hospital because Mother reported cocaine use one week prior to giving birth to

S.N.L. and that she had a history of mental illness, specifically schizophrenia. Mother also reported using alcohol. J.B. is alleged to be S.N.L.'s father. All CCDCFS's efforts to reach alleged Father were unsuccessful, and he had no contact during the pendency of the proceedings.

{¶ 6} At the time of the S.N.L.'s birth, Mother was homeless and living in a shelter. S.N.L., who was one year old at the time of the hearing, was committed to agency custody on November 10, 2020, when he was just over a month old, and has remained in continuous agency custody since that time. Flynn testified that CCDCFS implemented a case plan, which included services to address Mother's issues relating to mental health, substance abuse, and provision of housing and basic needs. Under the case plan, Mother was required to complete an updated mental health assessment, actively participate in mental health services, and follow recommendations; obtain housing and demonstrate the ability to provide basic needs; and complete a substance abuse assessment, follow all treatment recommendations, and submit to random drug screenings.

{¶ 7} Mother was referred to the Board of Developmental Disabilities based on her reporting that she had a history of schizophrenia and "DD" (developmental disabilities). Flynn further testified that Mother explained that "she receives [social security disability] income from being delayed and her father was her payee [and she] wasn't able to maintain her own financial means." Mother was also referred to mental health services. Flynn testified that Mother never completed the mental health services nor the "DD" services.

{¶ 8} With regard to visitation, Flynn testified that Mother has a weekly visitation plan. At the time of the hearing, her visits were one hour in duration. Her initial visits were two hours in duration, which Mother had with S.N.L. when he was first discharged from the hospital. Flynn testified that Mother was then missing for several months, from November 2020 through approximately February or March 2021. Flynn testified, "we couldn't find her. We did everything we could to locate her. Went to the shelter, going to places where we were told she would hang out. We even went to her boyfriend's treatment center looking for her at that time. We couldn't find her." Mother subsequently reengaged in her visits with S.N.L. after she was admitted to the Hitchcock Center for Women. Flynn testified that the visits were for two hours, but then were reduced to one hour at Mother's request "because [Mother] was bored with two hours of sitting with [S.N.L.]."

{¶ 9} During her visits with S.N.L., Mother was always excited to see him. Flynn testified that sometimes Mother "can be uncomfortable holding him. If he moves while she's holding him, she's uncomfortable and she hands him to whoever is next to her. [Mother] needs to be redirected after he eats not to bounce him or she needs to be reminded to burp him."

{¶ 10} Mother's case plan also included substance abuse services due to her history of substance abuse relating to alcohol, cocaine, and "ice," which Flynn described as a homemade synthetic drug made with different chemicals that has a heroin-like opiate effect. Mother was initially referred to services at Moore Counseling but was unsuccessfully discharged from that program. Consequently,

she was "referred for a higher level of care, which led her to the Hitchcock Center for Women."

{¶ 11} At time of the hearing, Flynn testified that Mother had completed the Hitchcock Center's inpatient and outpatient services for substance abuse but has not complied with random drug screens to demonstrate ongoing sobriety. Mother had not submitted to the requested screens since January 2021, despite CCDCFS's requesting such screens on an almost weekly basis during that time and providing her with bus tickets to facilitate compliance with the requests. As a result, Flynn could not verify if Mother was maintaining her sobriety at the time of the hearing. In addition, even though Mother had worked through the step-down program at the Hitchcock Center from inpatient to outpatient treatment, Flynn expressed concerns that Mother has not understood the lifelong commitment required to maintain ongoing sobriety, as well as the fact that Mother "has not been willing to engage in drug screens to prove that she's sober." Flynn further testified that Mother failed to complete her applications to obtain and maintain appropriate housing despite having the means to do so, even after receiving housing assistance from the agency.

{¶ 12} Following S.N.L.'s placement in agency custody, S.N.L. was engaged in services with a neurologist as well as in physical and occupational therapy because he was born with a portion of his brain undeveloped. Flynn testified that S.N.L. was utilizing occupational therapy because he is not walking yet. Flynn further testified that she believed permanent custody was in S.N.L.'s best interest because he "is

going to need * * * long-term care, a provider that's stable and able and willing to care for his special needs."

{¶ 13} S.N.L.'s foster mother, Katie Scalmato ("Scalmato"), testified that S.N.L., who recently turned one year old, has been living with her family since he was one month old. Scalmato described him as "very happy and energetic and talkative and adorable[,]" while noting that "[h]e does have delays [with crawling and walking], but overall he's doing pretty well." To address the delays, S.N.L. receives services from the Help Me Grow program. This includes weekly sessions with a physical therapist, who also offers occupational therapy. Scalmato testified the reason for S.N.L.'s delays is because "[p]art of his brain did not form. It was called a subarachnoid cyst and it causes issues with the pressure in his brain." Scalmato also described the need for constant monitoring of S.N.L. due to his ongoing needs. Flynn testified that S.N.L. is very well-bonded with his foster parents. He is very close to both and clings on them. She had "no concerns at all with their care for him." Flynn further testified that S.N.L. is "doing very well. He's thriving."

{¶ 14} Darlene Palmore ("Palmore"), a CCDCFS family advocate, testified that she worked with Mother. Palmore is a certified Chemical Dependency Counselor Assistant and a recovering addict herself. She expressed concerns regarding Mother because "she doesn't live a lifestyle of sobriety. She hasn't presented a lifestyle of sobriety." Palmore testified, "I think right now with [Mother] she's sober maybe possibly, I haven't seen any urine screens, but her lifestyle change,

she still acts like or presents to me that she hasn't made any mental changes with recovery or even understanding what recovery is about. [Mother] seems to think that this is a temporary kind of thing, not a permanent lifestyle." Palmore felt that Mother does not want to be too engaged. She elaborated that Mother "wants to stay under the radar as much as possible and do the minimum of what she is to do. For me I feel like [Mother] can do a lot more if she puts her mindset to it."

{¶ 15} One of Mother's witnesses, Charisma Fort ("Fort"), who is a social worker for the public defender's office, lent further credence to this characterization when she testified that she had attempted to assist Mother with contacting the Board of "DD" but that, as far as she knew, Mother "did not connect with them." Fort acknowledged there were "several things that need[ed] to be done on [Mother's] case plan." Fort further testified that although she encouraged Mother to connect with her referred housing program, at the time of the hearing, Mother had not engaged with that service and in fact was not linked with any services on her case plan other than the Hitchcock Center.

{¶ 16} Mother also offered testimony from Monica Haynes ("Haynes), who was recently promoted to recovery housing manager for the Hitchcock Center. Haynes testified that she was involved with Mother, "[m]aking sure she meets her requirements to be a tenant at recovery house" and working on Mother's "[c]ase management, urine screens and sober support." Haynes noted that Mother was required to attend five meetings a week. At the time of the hearing, Haynes testified that Mother just started to comply with this requirement in the previous "30 days or

so" but had failed to do so prior to that time. Haynes also acknowledged Mother did not have a sponsor. Haynes further testified that Mother had to submit to drug screens as a requirement of her residency at the Hitchcock Center, and Mother had not tested positive since April 2021. Haynes testified that while Mother had met the requirements to remain in this transitional housing, she was unaware if Mother had attempted to secure independent housing outside of the Hitchcock Center.

{¶ 17} Mother also presented testimony from Cari Kuhl ("Kuhl"), who had begun working as an outpatient counselor at Hitchcock Center for approximately two months at the time of the hearing. Kuhl testified that she had only worked with Mother for "about two weeks" during which Mother attended the twice-weekly, two-hour group meetings. As a result, Kuhl met with Mother for a total of four times in that two-week period. Kuhl testified that "unfortunately, because I didn't know [Mother] for too long we weren't able to do individual sessions, but in the group sessions and that setting she did well and interacted with me and I believe was able to utilize that."

{¶ 18} The guardian ad litem ("GAL") for S.N.L. provided his recommendation in favor of permanent custody. The record demonstrates that the GAL completed three reports throughout the pendency of the proceedings. In his last report dated October 5, 2021, the GAL noted that Mother is homeless, residing in transitional housing, historically has not taken medication as prescribed for her schizophrenia diagnosis, and currently does not have a treatment plan for her

mental-health issues. The GAL further noted that Mother was approved for housing but never followed through with and disengaged from her "DD" services.

{¶ 19} At the hearing, the GAL stated that "I don't think there's any question that [Mother] does have cognitive limitations and by her own admission she's schizophrenic." The GAL further testified that Mother "was referred to finish up that mental health evaluation, I'm assuming it would have addressed her cognitive limitations and she didn't go. Now, that's a pretty important step here to figure out what she needs, what her limitations are and what limitations have to be addressed in the future and it wasn't done." The GAL noted that the

> child is just not special needs. It's far, far beyond that. This child was born with a serious brain malformation who struggles every moment of everyday.
>
> Who needs a caregiver that can be there every moment of everyday and to understand what the doctors are, what the child's needs are. Understands what the child's physical conditions and medical conditions are and can understand what physical therapy has to be done, what vocational therapy has to be done, what speech therapy has to be done. What appointments, what medications, all that. And it's complex even under the best of circumstances.
>
> And in my estimation, there's no chance whatsoever in the circumstances that [Mother] could handle this. She hasn't handled her own business in this case. The two most important things, MRDD and that mental health evaluation.

{¶ 20} The GAL then mentioned some examples of his concerns for Mother's deficiencies and concluded by stating, "in my opinion the conditions of the dependency of the child, they existed when the child was found dependent and they clearly exist today. For that reason, that's why I'm recommending that permanent custody be granted."

{¶ 21} Following the conclusion of the hearing, the juvenile court granted permanent custody of S.N.L. to CCDCFS. The court found that S.N.L. was abandoned, had been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period, and cannot be placed with either of his parents within a reasonable period of time or should not be placed with either parent. The court further found that an award of permanent custody was in S.N.L.'s best interest.

{¶ 22} It is from this order that Mother appeals, raising the following two assignments of error for review.

> **Assignment of Error One:** The trial court's granting permanent custody of [S.N.L.] to [CCDCFS] is against the manifest weight of the evidence.

> **Assignment of Error Two:** The trial court abused its discretion by finding that granting permanent custody to [CCDCFS] was in the best interest of the child.

{¶ 23} Within these assigned errors, Mother argues that the juvenile court's award of permanent custody is against the manifest weight of the evidence and CCDCFS failed to produce competent, credible evidence that permanent custody was in S.N.L.'s best interest. Mother further argues that the juvenile court abused its discretion when it found that permanent custody to CCDCFS was in S.N.L.'s best interests.

{¶ 24} When reviewing a juvenile court's judgment in child custody cases, the Ohio Supreme Court has stated that the "court's decision in a custody proceeding is subject to reversal only upon a showing of abuse of discretion." *In re A.J.*, 148

Ohio St.3d 218, 2016-Ohio-8196, 69 N.E.3d 733, ¶ *27*, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 417, 674 N.E.2d 1159 (1997).

{¶ 25} We recognize that the "[t]ermination of parental rights is an alternative of last resort but is sanctioned when necessary for the welfare of a child." *In re M.S.* at ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). Before a court may terminate parental rights and award permanent custody of a child to the proper agency, it must determine by clear and convincing evidence that (1) one of the factors enumerated in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) an award of permanent custody is in the child's best interest. R.C. 2151.414(B).

{¶ 26} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re C.B.*, 8th Dist. Cuyahoga No. 92775, 2011-Ohio-5491, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). "Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

{¶ 27} "'An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence.'" *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28, quoting *In re Jacobs*, 11th Dist. Geauga No. 99-G-

2231, 2000 Ohio App. LEXIS 3859, 11 (Aug. 25, 2000), citing *In re Taylor*, 11th Dist. Ashtabula No. 97-A-0046, 1999 Ohio App. LEXIS 2620 (June 11, 1999). *See In re AR.S.*, 2021-Ohio-1958, 174 N.E.3d 28 (8th Dist.)

**{¶ 28}** Relevant to the instant case, the factors set forth in R.C. 2151.414(B)(1) include the following: the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent; the child is abandoned; and the child has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(a), (b), and (d).

**{¶ 29}** We note that "[o]nly one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 8th Dist. Cuyahoga No. 110505, 2021-Ohio-3821, ¶ 27, citing *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657.

**{¶ 30}** Here, the juvenile court found that S.N.L. "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents" as set forth in R.C. 2151.414(B)(1)(a). In cases where R.C. 2151.414(B)(1)(a) applies, courts look to the factors set forth in R.C. 2151.414(E) to determine whether a child cannot be placed with a parent within a reasonable time or should not be placed with a parent. These factors include, among others, whether the parent failed continuously and repeatedly to substantially remedy the conditions that had caused the removal of the child, including parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material

resources that were made available to the parent (R.C. 2151.414(E)(1)); whether chronic mental illness, intellectual disability, physical disability, or chemical dependency of the parent is so severe that it makes the parent unable to provide an adequate permanent home for the child (R.C. 2151.414(E)(2)); whether the parent has demonstrated a lack of commitment toward the child by failing to regularly visit or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child (R.C. 2151.414(E)(4)); and whether the parent has abandoned the child (R.C. 2151.414(E)(10)). The statute also permits the court to consider "any other factor the court considers relevant." R.C. 2151.414(E)(16).

{¶ 31} Only one of the enumerated factors under R.C. 2151.414(E) is required to exist for the court to make the finding that "'the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.'" *In re L.W.*, 8th Dist. Cuyahoga No. 107708, 2019-Ohio-1343, ¶ 29, quoting *In re Glenn*, 139 Ohio App.3d 105, 113, 742 N.E.2d 1210 (8th Dist.2000), and citing *In re R.M.*, 8th Dist. Cuyahoga Nos. 98065 and 98066, 2012-Ohio-4290, ¶ 14 (the existence of only one factor will support the court's finding that the child cannot be reunified with the parent within a reasonable time).

{¶ 32} In the instant case, the juvenile court's finding under R.C. 2151.414(B)(1)(a) relied on the factors set forth under R.C. 2151.414(E)(1), (2), (4), and (10). The court stated in relevant part:

> The Court finds that the child is abandoned.

* * *

The Court further finds:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

The chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year.

The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶ 33} Mother argues that CCDCFS did not prove by clear and convincing evidence that she abandoned her child, she demonstrated a lack of commitment to S.N.L., and she suffered from chronic mental illness that made her unable to provide an adequate home for S.N.L. Mother contends that it is not clear that she failed to visit or maintain contact with her child for more than 90 days and that she suffered from a chronic mental illness. She further contends there was no credible evidence that she demonstrated a lack of commitment to her child. Mother submits that she can complete the remainder of the services on her case plan in less than a year's time. Therefore, she maintains that the termination of her parental rights was not the remedy of last resort.

{¶ 34} A review of the record in this case clearly and convincingly supports the trial court's determination that S.N.L. could not be placed with Mother within a reasonable period of time. The testimony at the hearing demonstrated that Mother was provided with referrals for her case plan services, and that while she did complete inpatient and outpatient substance abuse treatment, she had failed to demonstrate sufficient benefit from those services. Mother also did not demonstrate a plan for sober living; had failed to submit to the weekly drug screen requests made by CCDCFS, despite CCDCFS providing her bus tickets to facilitate her compliance with drug screen requests; did not secure appropriate housing; and had not completed mental health treatment services.

{¶ 35} The record further supports the trial court's determination that Mother's chronic mental illness is so severe that it makes her unable to provide an adequate permanent home for S.N.L. Mother was diagnosed with schizophrenia and was referred to the Board of Developmental Disabilities based on her admission that she had a history of "DD." Flynn testified that Mother never completed those services as referred. Mother was also referred for mental health services. Flynn further testified that Mother attended the initial intake for this service but never followed through with the rest of the intake services. According to the GAL, Mother historically has not taken her prescribed medication for her schizophrenia diagnosis. Additionally, Mother self-reported a history of substance abuse relating to alcohol, cocaine, and "ice." Flynn testified that Mother was referred to services at Moore Counseling but was unsuccessfully discharged from that program and was

then referred to the Hitchcock Center. Palmore testified that she was concerned that Mother does not live a lifestyle of sobriety.

{¶ 36} With regard to lack of commitment, the evidence establishes that Mother did not complete the required case plan services to achieve reunification and did not demonstrate interest in maximizing opportunities to be with S.N.L. Mother lacked engagement in mental health services, failed to submit to drug screens as requested by CCDCFS, and failed to secure housing. Furthermore, Flynn testified that Mother was missing for approximately four months after S.N.L. was placed in custody and requested a decrease in her weekly visitation with S.N.L. because she was "bored" with two hours of sitting with S.N.L.

{¶ 37} Lastly, with regard to abandonment, the testimony established that Mother visited S.N.L. when he first was discharged from the hospital, but then Mother was missing for several months. Flynn testified that Mother had no contact with S.N.L. for approximately four months. "[A] child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C).

{¶ 38} We recognize that Mother has taken some steps to address her mental illness and substance abuse. However, as this court has previously stated, "[a]lthough commendable, this does not of itself preclude a grant of permanent custody to a children services agency. Substantial compliance with a case plan does not mean that the parent has achieved the ultimate goals of the plan or that the

parent has substantially remedied the conditions that caused the children to be removed." *In re A.P.,* 8th Dist. Cuyahoga No. 104129, 2016-Ohio-5848, ¶ 19, citing *In re J.B.,* 8th Dist. Cuyahoga Nos. 98566 and 98567, 2013-Ohio-1706. Although Mother participated in case plan services and had visitation, she abandoned S.N.L. for approximately four months and she did not provide any support or other assistance to him during the entire time he was in the temporary custody of CCDCFS.

{¶ 39} Collectively, this evidence supports the trial court's finding that Mother failed to remedy the conditions that caused S.N.L. to be placed outside the home. While these actions alone are sufficient to satisfy the first prong of R.C. 2151.414(B), Mother's actions also demonstrated that she abandoned S.N.L., a lack of commitment to S.N.L., and she was unable to provide S.N.L. with a safe and permanent home. Accordingly, we find the record clearly and convincingly supports the court's conclusion that S.N.L. could not or should not be placed with Mother within a reasonable time.

{¶ 40} Having found that the trial court properly concluded that at least one of the R.C. 2151.414(B)(1) conditions applies, we must next determine whether the trial court appropriately found by clear and convincing evidence that granting permanent custody to the agency is in S.N.L.'s best interest.

{¶ 41} In determining the best interest of a child, the juvenile court must consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 42} Although a trial court is required to consider each relevant factor under R.C. 2151.414(D)(1) in deciding to award permanent custody, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. This court has stated that only one of these enumerated factors needs to be resolved in favor of the award of permanent custody. *In re L.W.*, 2019-Ohio-1343, at ¶ 39, citing *In re Moore*, 8th Dist. Cuyahoga No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000).

{¶ 43} Here, the juvenile court found that "a grant of permanent custody is in the best interests of the child and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent." As

stated above, the testimony presented at the hearing demonstrated that Mother was missing for approximately four months after S.N.L.'s discharge from the hospital. Mother eventually resumed visiting the child when she went to Hitchcock Center. These visits initially lasted for two hours but then were reduced to one hour at Mother's request. While Mother did engage in some substance abuse and mental health assessments and treatment programs, Mother was not able to demonstrate proof of sobriety and failed to obtain stable housing of her own. In addition, all efforts by CCDCFS to reach S.N.L.'s alleged Father were unsuccessful, and he had no contact during the pendency of the proceedings. The testimony also demonstrated that S.N.L. was very well-bonded with his foster parents.

{¶ 44} Furthermore, the GAL recommended that the court find permanent custody to be in S.N.L.'s best interests. The GAL stated that S.N.L. "is just not special needs. * * * [He] child was born with a serious brain malformation who struggles every moment of everyday [and] * * * needs a caregiver that can be there every moment of everyday[.]" The GAL opined that Mother was not capable of caring for S.N.L. since she has not been able to complete her own case plan. Moreover, in his October 2021 report, the GAL noted that Mother historically has not taken her medication and currently does not have a mental health treatment plan. He further noted that Mother was approved for housing but failed to follow up with those services.

{¶ 45} Based on the foregoing, we find there is clear and convincing evidence in the record to support the juvenile court's determination that permanent custody

to CCDCFS is in S.N.L.'s best interests. Accordingly, we find that the juvenile court's decision to grant permanent custody is not against the manifest weight of the evidence as Mother contends. We further find that the court did not abuse its discretion in determining that permanent custody of S.N.L. be awarded to CCDCFS.

{¶ 46} Therefore, the first and second assignments of error are overruled.

{¶ 47} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

SEAN C. GALLAGHER, A.J., and
EILEEN T. GALLAGHER, J., CONCUR