[Cite as *In re P.S.*, 2023-Ohio-144.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE P.S.                                       :

                                                 :                No. 111817

A Minor Child                                    :

                                                 :

[Appeal by O.S., Mother]                         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 19, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-19900639

---

### *Appearances:*

Christina M. Joliat, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant, Mother, appeals a juvenile court judgment granting

permanent custody of her child, P.S., to the Cuyahoga County Division of Children

and Family Services ("CCDCFS" or "the agency"). She claims the following error:

> The trial court order granting permanent custody to the agency was
> based upon insufficient evidence and was against the manifest weight

of the evidence, and it erred in finding permanent custody to be in the best interest of the child.

{¶ 2} We affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} On January 16, 2019, CCDCFS filed a complaint alleging that P.S. was a neglected and dependent child and requesting an order granting temporary custody of the child to CCDCFS. Following a hearing that same day and with Mother's consent, the trial court ordered the child into the predispositional temporary custody of CCDCFS. After a dispositional hearing, the trial court ordered P.S. placed in the temporary custody of CCDCFS in May 2019.

{¶ 4} In June 2020, CCDCFS filed a motion to modify temporary custody to permanent custody. The court conducted a trial on the motion on May 23, 2022. Deidre Hogue ("Hogue"), an extended-service social worker with CCDCFS, testified that she received P.S.'s case in February 2019, and worked with Mother for the duration of the case. According to Hogue, the agency became involved in P.S.'s case in December 2018, when Mother was hospitalized for having thoughts of harming the child. (Tr. 93.)[1] Mother initially agreed to the terms of a safety plan that prohibited her from being alone with P.S., and Mother and child moved in with a family friend. However, a short time later, Mother and P.S. moved back in with the child's alleged father, who had a criminal history of assaults and domestic violence. (Tr. 11, 15, 54.) Consequently, CCDCFS sought and obtained temporary custody of

---

[1] All citations to the transcript refer to the May 23, 2022 trial transcript.

P.S. on January 16, 2019. P.S. was three years old at the time of trial in May 2022, and was, therefore, an infant when she entered agency custody in January 2019. (Tr. 11.)

{¶ 5} The agency developed a case plan aimed at promoting permanent reunification of Mother and child. The case plan included services to address Mother's issues with parenting, mental health, domestic violence, and provision of basic needs such as stable housing and employment. (Tr. 12, 14-15, 18.) The agency also had concerns regarding the child's alleged father and his violent criminal history and history of domestic violence. The alleged father refused to meet with case workers to discuss the case plan, and he is not a party to this appeal.

{¶ 6} Mother was diagnosed with Post-Traumatic Stress Disorder ("PTSD") and claimed to hear voices. (Tr. 23, 93-94.) She initially engaged in mental-health services through FrontLine Service and Ohio Guidestone, but her compliance with the services was inconsistent. She attended therapy sessions from February 2019 through October 2019, but stopped services altogether in January 2020. She did not resume mental-health services until February 2021. (Tr. 22-23, 24, 87.) Mother testified at trial and acknowledged that she resumed mental-health services at FrontLine Service in early 2021, explaining that she was more comfortable with in-person services rather than virtual appointments. (Tr. 121-122.)

{¶ 7} Hogue testified that Mother was not compliant with her psychiatric medications. (Tr. 32-34, 87-88.) Hogue explained that during her most recent home visit, shortly before trial, she observed that Mother was out of her medication.

Mother told Hogue that she threw the medication away and that she had missed her appointment to obtain a refill of the medication. (Tr. 33-34, 149.) Hogue testified that Mother also failed to take her medication from September 2021 through April 2022. (Tr. 34-36.)

{¶ 8} Mother admitted during her trial testimony that she sometimes forgot to take her medication as prescribed and that she missed a recent psychiatric appointment for medication management because she failed to check her email to verify the appointment. (Tr. 124-126, 156-157.) Hogue testified that Mother's lack of compliance with mental-health services was an ongoing concern because she hears voices and previously had thoughts of harming the child. (Tr. 37-38, 59, 93-94.) Hogue explained:

> At one point I believe in February she told me that the voices are kinda like non-stop and that she is hearing them more frequently than she had been hearing in a long time, * * * actually she did tell me that — mom reports that the medication she has helps her with the voices.

(Tr. 38.)

{¶ 9} FrontLine therapist, Angela Zamora ("Zamora"), testified that she has been working with Mother since February 2022, when she took over as Mother's therapist. Zamora testified that Mother had been engaged in counseling at FrontLine since March 2021. According to Zamora, Mother was "fairly consistent" in attending her scheduled appointments, and that Mother was diagnosed as having PTSD. (Tr. 104.) Zamora testified that her therapy focused on interpersonal relationships, but she indicated that a mental-health goal could be added to Mother's

treatment plan. Zamora does not participate in Mother's psychiatry appointments, nor does she regularly discuss Mother's medication compliance, but Mother admitted to Zamora that she missed some of her psychiatry appointments. (Tr. 106-107, 115.) Zamora acknowledged that she is not familiar with the medications prescribed to Mother. (Tr. 110.) On cross-examination, Zamora also admitted she had no knowledge of the fact that Mother had had thoughts of harming her child, and she acknowledged it would be important for Mother to make all psychiatric visits if that were the case. (Tr. 115.)

{¶ 10} At the time P.S. was removed from Mother's care, Mother was homeless and unemployed. (Tr. 19.) Consequently, Mother's case plan included a basic needs objective, and the agency referred Mother to Community Collaborative for assistance with housing and employment. (Tr. 19.) Mother was staying at the North Point Shelter from February 2019 through March 2020. Over the course of the proceedings, Mother lived in three different homes and at the shelter. (Tr. 52-53, 89.)

{¶ 11} Mother acknowledged at trial that she has struggled with homelessness. When asked how many times over the course of the proceedings she stayed in a shelter, Mother replied, "There was North Point. I was in and out of North Point three times." (Tr. 127.) Although Mother eventually obtained her own apartment, the agency remained concerned about Mother's ability to maintain stable housing because she had not paid rent for the last six months prior to trial, and the agency was worried she could be evicted. (Tr. 48-49, 82-83, 89.) And

despite referrals, Mother failed to seek assistance with rent through Community Collaborative. (Tr. 99-100.)

{¶ 12} Additionally, when Hogue visited Mother's home in April 2022, the month before trial, the home lacked heat and hot water. (Tr. 49.) Mother told Hogue she had been heating the home with an electric stove. (Tr. 49.) There were also plumbing problems in the home. A bathroom drain had been clogged since Mother moved into the home in September 2021, and the kitchen sink pipes were leaking. (Tr. 49-50, 52.) The hot water problem was subsequently fixed, but Mother had not asked the landlord to fix the heating problem, which remained an issue of concern. (Tr. 77-78, 80.)

{¶ 13} Mother also failed to keep adequate food in the home. Mother told Hogue that she had been employed doing credit collections for a few months prior to trial, but she only produced one pay stub. She also claimed to have been employed at McDonald's for almost a year, but never produced any documentation to substantiate the claim. (Tr. 53, 79.)

{¶ 14} Hogue testified that Mother was referred to a parenting program through Ohio Guidestone and for domestic-violence services through Domestic Violence Advocacy Center ("DVAC"). Mother completed the domestic-violence class at DVAC, but she was subsequently involved in another domestic-violence incident. Consequently, the agency referred Mother to Able Counseling for additional domestic-violence classes, but she failed to complete the classes. (Tr. 20-21.) Mother completed a second series of domestic-violence classes through Moore

Counseling in June 2021, and Hogue believed that she benefitted from the second program because she has not had any domestic-violence incidents since she completed the class. (Tr. 21, 27.)

{¶ 15} Mother completed a parenting program in 2019, but she did not appear to benefit from the program and later engaged in a second parenting program that she completed in June 2021. (Tr. 21.) Despite having participated in two parenting programs, Mother continued to demonstrate concerning behaviors during visits with P.S. Hogue explained that Mother has difficulty redirecting P.S. when she misbehaves and that she has hit the child three times during visits. (Tr. 28-30, 152.) Mother admitted to Hogue that she hit P.S. within three weeks of trial, but she claimed that she did not hit her with any force. Mother also claimed that she "popped the child on the behind," but agency personnel observed a red mark on the child's leg. (Tr. 30-31.)

{¶ 16} Hogue discussed Mother's method of disciplining P.S. with Mother and tried to direct Mother to more appropriate forms of discipline in keeping with the parenting-program training. However, Mother told Hogue that she uses the verbal commands and timeouts that she learned in parenting classes "in addition to popping the child." (Tr. 31.)

{¶ 17} CCDCFS scheduled visits between Mother and P.S. once per week. Although the agency offered a second weekly visit, Mother declined the additional visit. (Tr. 40-41.) Mother stopped visiting P.S. altogether from May 2020 through August 2020, when visits were virtual rather than in-person due to the Covid-19

pandemic. Mother resumed visits briefly in August 2020, but she again stopped attending visits between December 2020 and February 2021. Mother resumed visits in February 2021, and Mother and child appeared to be bonded and "happy to see each other." (Tr. 44-45.)

{¶ 18} Mother eventually progressed to unsupervised visits in September 2021, but, as previously stated, Mother continued to struggle to redirect P.S. when she would smack and hit Mother, throw her stuff on the floor, and fail to follow through on Mother's directions. (Tr. 43-45.)

{¶ 19} Finally, Hogue testified that P.S. has been with the same foster family since she was removed from Mother in January 2019. The foster mother is a friend of Mother's family. Indeed, Mother suggested the friend for placement at the time of P.S.'s removal. (Tr. 54-55, 57-58.) According to Hogue, P.S. is "very bonded" with the foster family and is thriving in their care. (Tr. 57-58.) P.S. is a healthy child with no special needs.

{¶ 20} CCDCFS was seeking permanent custody of P.S. because it did not believe that either parent could provide a safe and permanent home for her within a reasonable time. When asked whether either parent could provide a safe and stable home for P.S., Hogue replied:

> No. * * * Mom is inconsistent with her mental health and she has demonstrated being inconsistent with her mental health.
>
> * * * [A]lthough there's no evictions for her housing currently that I'm aware of, mom still has a history of struggling with homelessness and even know [sic] she has an issue with providing for [P.S.] and maintaining her home and the rents.

> You know, for parenting it is a concern for me that mom has had three allegations of hitting the child during visits, especially when the child was removed for mom having thoughts of wanting to harm the child.

(Tr. 59.) Hogue further stated she believes permanent custody is in P.S.'s best interest because she needs a safe and permanent home. The foster family is willing to adopt P.S. and, as previously stated, P.S. is thriving in their care.

{¶ 21} At the conclusion of the hearing, Jean Brandt ("Brandt"), P.S.'s guardian ad litem, recommended the court grant permanent custody of P.S. to the agency. She explained that "the child's best interest would be served by granting the CCDCFS motion to modify temporary custody to permanent custody." (Tr. 158.) Brandt observed that P.S. had been in agency custody for more than 24 months and that, "despite a genuine effort on her part, [Mother] has failed to fully resolve the issues that led to this matter being initiated." (Tr. 158.) Brandt also noted that Mother "is still struggling with mental health services and to be completely medication-compliant." (Tr. 159.)

{¶ 22} The juvenile court later issued a judgment entry ordering that P.S. be placed in the permanent custody of CCDCFS. Mother now appeals the trial court's judgment.

## II. Law and Analysis

{¶ 23} In the sole assignment of error, Mother argues the trial court's award of permanent custody is not supported by sufficient evidence and is against the manifest weight of the evidence.

{¶ 24} A parent has a "fundamental liberty interest * * * in the care, custody, and management of [his or her child]." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The termination of parental rights is regarded as "'the family law equivalent of the death penalty in a criminal case.'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. Consequently, parents "'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991).

{¶ 25} Nevertheless, a parent's right to the care and custody of his or her child is not absolute. *In re L.G.*, 8th Dist. Cuyahoga No. 110789, 2022-Ohio-529, ¶ 49. "'[T]he natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principal to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 26} Ohio statutes governing child custody and protection "appropriately reflect the need to balance * * * [the] parents' * * * interest in the custody, care, nurturing, and rearing of their own children, and the state's parens patriae interest in providing for the security and welfare of children under its jurisdiction[.]" *In re Thompson*, 10th Dist. Franklin No. 00AP-1358, 2001 Ohio App. LEXIS 1890 (Apr. 26, 2001).

## A. Standard of Review

{¶ 27} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e).

{¶ 28} Only one of the factors listed in R.C. 2151.414(B)(1)(a)-(e) must be established to satisfy the first prong of the two-part analysis for granting permanent custody of a child to an agency. *In re D.H.*, 8th Dist. Cuyahoga No. 110505, 2021-Ohio-3821, ¶ 27, citing *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657. If any one of the factors listed in R.C. 2151.414(B)(1)(a)-(e) is established, the court may move to the second prong of the analysis, which requires the juvenile court to

determine, by clear and convincing evidence, whether it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 29} "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 30} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.*, 8th Dist. Cuyahoga No. 99931, 2014-Ohio-2051, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re C.N.*, 10th Dist. Franklin No. 15AP-67, 2015-Ohio-2546, ¶ 9, citing *State v. Howze*, 10th Dist. Franklin No. 13AP-386, 2013-Ohio-4800, ¶ 10.

## B. First Prong

{¶ 31} With respect to the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(d), that "[t]he child has been in the temporary custody of a public children services agency or private child placing

agency for twelve or more months of a consecutive twenty-two month period." (July 20, 2022, journal entry p.3.)

{¶ 32} Hogue testified that P.S. went into agency custody on January 16, 2019, where she remained until the time of trial on May 23, 2022. (Tr. 11, 54.) R.C. 2151.414(B)(1) states, "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."

{¶ 33} Mid-March 2019 would have marked 60 days from the date P.S. was removed from Mother's care. Trial was held on May 23, 2022, more than three years later. And, as previously stated, Hogue testified that P.S. remained in agency custody for the entire duration of those three years, and there was no evidence to contradict this testimony. Therefore, there was competent, credible evidence to support the juvenile court's finding that P.S. had been in temporary agency custody for 12 or more months of a consecutive 22-month period, and the first prong of the permanent custody analysis has been established.

{¶ 34} Having found that P.S. had been in temporary custody for more than 12 months of a consecutive 22-month period, the juvenile court had concluded the first prong of the permanent custody analysis and moved on to consider the best interest of the child. Nevertheless, the juvenile court further found that "one or more of the factors in division (E) of section 2151.414 of the Revised Code exist and the child cannot be placed with one of the child's parents within a reasonable period of

time or should not be placed with either parent[.]" (July 20, 2022, journal entry p.3.)

{¶ 35} R.C. 2151.414(E) provides a list of factors the court must consider in determining whether or not children can be placed with a parent within a reasonable time. If the juvenile court finds, by clear and convincing evidence, that at least one of these enumerated factors exists as to each of the child's parents, the juvenile court must find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E).

{¶ 36} The juvenile court found that P.S. could not be placed with either parent within a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414(E)(1). R.C. 2151.414(E)(1) provides that the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent if it finds that

> [f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

{¶ 37} Hogue testified that the agency developed a case plan to assist Mother in addressing her issues with parenting, mental health, domestic violence, and the provision of basic needs, including housing and employment. Mother initially engaged in mental-health services with FrontLine Service and later with Ohio Guidestone, from February 2019 through October 2019, after which she missed

several appointments and stopped treatment altogether in January 2020. Mother did not reengage in these services until February 2021.

{¶ 38} Although Mother was "fairly consistent" in attending therapy appointments since February 2022, she was not compliant in taking her medication as prescribed. (Tr. 23, 32-34, 87-88.) Hogue testified that during the most recent home visit, she discovered that Mother was out of medication. When Hogue questioned Mother about the medication, Mother told her that she threw the medication away and that she had missed her appointment to obtain a medication refill. (Tr. 33-34, 149.) Mother admitted during her trial testimony that she sometimes forgot to take her medication as prescribed, and admitted that she missed a recent psychiatry appointment for medication management because she failed to check her email to verify the appointment. (Tr. 124-126, 156-157.)

{¶ 39} Hogue testified that Mother's failure to take her prescribed medication was an ongoing concern because she "hears voices." (Tr. 37.) Mother told Hogue shortly before trial that "the voices are kinda like non-stop" and that "she is hearing them more frequently than she had been hearing in a long time." (Tr. 37-38, 93-94.) Thus, the record supports the juvenile court's finding that Mother was not compliant with her mental-health services.

{¶ 40} The record also supports a finding that Mother failed to benefit from the parenting component of her case plan. Mother completed a parenting program through Ohio Guidestone, but she continued to exhibit concerning behaviors after completing the parenting class. Consequently, Mother engaged in a second

parenting program that she completed in June of 2021. Despite having completed two parenting programs, Mother continued to have difficulty redirecting P.S. when necessary, and Mother continued to hit P.S. inappropriately. When Hogue attempted to remind Mother of more appropriate forms of discipline such as redirection and timeouts, Mother replied that she used verbal commands to redirect P.S. and timeouts "in addition to popping the child." (Tr. 31, 71-72.) The court found Mother's acts of hitting the child particularly alarming since Mother admitted to previously having thoughts of harming P.S. Therefore, the court's concern that Mother failed to benefit from the parenting classes is supported by competent, credible evidence.

{¶ 41} The evidence also shows that Mother failed to demonstrate that she could provide basic needs such as employment and housing. Mother claimed to be employed in various jobs, but she only produced one pay stub for one of the jobs, despite Hogue's requests for more documentation. And, Mother had not paid rent for the six months prior to trial, and there was threat that she could be evicted. Moreover, Mother's home did not have heat, and Mother made no effort to contact the landlord to remediate this problem. Therefore, the evidence showed that Mother failed to significantly benefit from the basic needs component of her case plan.

{¶ 42} Moreover, Brandt opined at trial that Mother "has failed to fully resolve the issues that led to this matter being initiated." (Tr. 158.) Brandt observed that Mother "is still struggling with mental health services and to be completely

medication-compliant." Therefore, the trial court's finding, pursuant to R.C. 2151.414(E)(1), that P.S. could not be placed with either parent within a reasonable time or should not be placed with either parent is supported by competent, credible evidence.[2]

## C. Best Interest of the Child

{¶ 43} Having determined that the manifest weight of the evidence supports the juvenile court's finding that P.S. had been in temporary agency custody for 12 or more months of a consecutive 22-month period, and could not be returned to either parent within a reasonable time, we now turn to the second prong of our analysis, which requires the court to determine, by clear and convincing evidence, whether it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 44} We recognize that, given the nature of the proceeding and the impact the court's decision will have on the lives of the parties concerned, the juvenile court enjoys broad discretion in determining whether an order of permanent custody is in the child's best interest. *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994). We, therefore, review a juvenile court's determination of a child's best interests under R.C. 2151.414(D) for an abuse of discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47.

---

[2] The trial court also found, pursuant to R.C. 2151.414(E)(3), that P.S.'s alleged father abandoned her because he failed to communicate with the child, failed to visit the child, and refused to engage in any services that could assist in reuniting him with P.S. However, as previously stated, Father is not a party to this appeal.

{¶ 45} An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. In other words, "[a] court abuses its discretion when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 19.

{¶ 46} This court has held that an abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.). When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

{¶ 47} In determining the best interest of the child, R.C. 2151.414(D) requires the court to consider all relevant factors, including but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of

placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶ 48} Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent custody determination, "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Moreover, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re S.C.*, 8th Dist. Cuyahoga No. 102350, 2015-Ohio-2410, ¶ 30.

{¶ 49} Although there was evidence that P.S. was bonded with Mother and that they love each other, there was also evidence that P.S. is bonded with her foster family and that she is thriving in their home. Therefore, the factor set forth in R.C. 2151.414(D)(1) is neutral to the extent the evidence shows that P.S. is bonded to both Mother and her foster family. However, the guardian ad litem stated she believes P.S. will thrive with the foster family because the foster family provides a safe and stable home whereas Mother has failed to resolve her mental-health issues and has failed to demonstrate that she provide a stable home for P.S. Therefore, the factor set forth in R.C. 2151.414(D)(2) weighs in favor of permanent custody.

{¶ 50} With regard to P.S.'s custodial history, the evidence shows that she has been living with the same foster family almost her entire life. She has lived with the foster family for over three years, and she was three years old at the time of trial. Moreover, the foster family is willing to adopt P.S. and will, therefore, provide her a

permanent home. Therefore, the factors set forth in R.C. 2151.414(D)(3) and 2151.414(D)(4) weigh heavily in favor of permanent custody, and the trial court's findings are supported by the manifest weight of the evidence.

{¶ 51} Moreover, if all the factors outlined in R.C. 2151.414(D)(2) are established, then the trial court must grant permanent custody of the child to the agency. *See In re P.J.*, 8th Dist. Cuyahoga No. 110121, 2021-Ohio-1821, ¶ 26 ("Because all the factors under R.C. 2151.414(D)(2) apply, permanent custody was necessarily in the best interest of the child and the juvenile court was required to grant permanent custody to CCDCFS."). R.C. 2151.414(D)(2) states:

> (2) If all of the following apply, permanent custody is in the best interest of the child, and the court shall commit the child to the permanent custody of a public children services agency or private child placing agency:
>
> (a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.
>
> (b) The child has been in an agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Revised Code.
>
> (c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.
>
> (d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child.

{¶ 52} As previously explained, the record supports the trial court's finding that P.S. could not be placed with either of her parents within a reasonable time or

should not be placed with either parent as outlined in R.C. 2151.414(D)(2)(a). The undisputed evidence also demonstrates that P.S. has been in temporary custody for approximately three years and, therefore, was in agency custody for two or more years, as outlined in R.C. 2151.414(D)(2)(b).

{¶ 53} P.S. could not meet the requirements for a planned permanent living arrangement as provided in R.C. 2151.414(D)(2)(c), because she was only three years old and one of the requirements is that the child is 16 years of age or older. *See* R.C. 2151.353(A)(5).

{¶ 54} Finally, the consideration listed in R.C. 2151.414(D)(2)(d) is established if "[p]rior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the child." The record shows that no motion for legal custody was filed by any individual in this case. Therefore, this factor was satisfied at the time of trial, and the trial court noted in its entry that "no relative or other interested person has filed or has been identified in a motion for legal custody of the child[.]" (July 20, 2022, journal entry.)

{¶ 55} The record demonstrates that all the factors listed in R.C. 2151.414(D)(2) apply to the facts of this case. Therefore, permanent custody was necessarily in the best interest of the child, and the juvenile court was required to grant permanent custody to CCDCFS. *In re P.J.*, 8th Dist. Cuyahoga No. 110121, 2021-Ohio-1821, at ¶ 26. Therefore, the sole assignment of error is overruled.

{¶ 56} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
EILEEN A. GALLAGHER, J., CONCUR