[Cite as *In re A.M.*, 2025-Ohio-1741.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE A.M.                          :

A Minor Child                       :          No. 114596

[Appeal by Mother]                  :

:

:

:

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 15, 2025

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD22900021

### *Appearances:*

Wegman Hessler Valore and Michael Gordillo, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant, Mother, appeals a judgment of the Cuyahoga County Common Pleas Court, Juvenile Division, granting permanent custody of her minor child, A.M., to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). She claims the following errors:

1. The trial court's decision to terminate appellant's parental rights and to award permanent custody of the [child] to CCDCFS was not supported by sufficient evidence.

2. The trial court's decision to terminate appellant's parental rights and to award permanent custody of the [child] to CCDCFS was against the manifest weight of the evidence.

{¶ 2} We affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} In January 2022, CCDCFS filed a complaint for neglect and dependency, alleging that A.M. and his siblings were neglected and dependent. The complaint alleged that A.M. and his siblings were previously removed from Mother's care following a domestic-violence incident that occurred between Mother and the father of A.M.'s older siblings. As a result of this incident, the father of A.M.'s siblings ("A.J.") was awarded legal custody of A.M.'s siblings and A.M., even though he was not the father of A.M. A.M.'s alleged father never established paternity, never supported or communicated with A.M. since his birth, and is currently incarcerated with a scheduled release date in 2048.

{¶ 4} On January 2, 2022, A.J. was stabbed to death, and the police removed the children from his home. Two days later, on January 4, 2022, the court committed A.M. to emergency custody of CCDCFS. The complaint, which was filed the day after A.J.'s death, alleged that Mother had not visited or communicated with the children since A.J. was awarded legal custody. The complaint also alleged that Mother had previously been convicted of child endangering in 2016 and that Mother had mental-health issues including bipolar disorder and schizophrenia that

interfered with her ability to provide a safe home for the children. In its prayer for relief, the agency requested an order granting the agency temporary custody of A.M. The trial court granted the agency's request for temporary custody in April 2022. (Tr. 13.)[1] The court's order granting temporary custody of A.M. to the agency was extended twice. However, in December 2023, the agency filed a motion to terminate temporary custody and for an order granting the agency permanent custody of A.M.

{¶ 5} The trial court conducted a trial on the agency's motion for permanent custody in October 2024. Crystal Keener ("Keener"), an extended child-protection specialist with CCDCFS, testified that she has been the caseworker assigned to A.M.'s case since November 2023. Keener testified that CCDCFS developed a case plan for Mother in early 2022, with the goal of reunification. (Tr. 13.) The case plan included services for substance abuse, anger management, and housing.

{¶ 6} At the time of trial, Mother had completed an anger-management course through Able Counseling and "she has been able to demonstrate what she learned in anger management." (Tr. 14.) Mother also obtained housing and was referred for a substance-abuse assessment, but the results of the assessment were not yet available at the time of trial. (Tr. 14.)

{¶ 7} A.M. was nine years old at the time of trial. (Tr. 8.) Keener testified that, at the time of the October 2024 trial, A.M. had been in uninterrupted agency custody since January 2022. The agency investigated relatives as potential

---

[1] Unless otherwise noted, all references to the transcript refer to the transcript of the permanent custody trial conducted on October 2, 2024.

caregivers, but they did not find any relative who was willing and able to care for A.M. As a result, A.M. was placed with a foster family. (Tr. 26.)

{¶ 8} A.M. was subsequently removed from the foster family and placed with Ohio Guidestone because he exhibited violent and disruptive behavior that required a higher level of care than a foster family could provide. (Tr. 26.) At the time of trial, A.M. had been at Ohio Guidestone for approximately a year and one half. Keener testified that she spoke with A.M. about his wishes. According to Keener, sometimes A.M. said that he wants to go home with Mother, but other times he said that he does not want to live with Mother. "[I]t depends on the day." (Tr. 33.)

{¶ 9} Mother and her two younger children visited A.M. at Ohio Guidestone once per month. She also attended A.M.'s treatment meetings at Ohio Guidestone and supported the treatment recommendations of A.M.'s medical and mental-health providers. (Tr. 29-31.) A.M. was diagnosed with ADHD, PTSD, and disruptive mood dysregulation disorder. (Tr.35.) A.M. was prescribed multiple medications to treat his various mental-health conditions, but none of them seemed to be working. (Tr. 32-33.)

{¶ 10} In addition to medication, A.M. engaged in daily individual and group therapy. He also participated in equine therapy at a horse camp during the summer. Yet, at the time of trial in October 2024, A.M.'s behavior had not improved, and the agency believed that he continued to pose a danger to himself, to Mother, and to A.M.'s younger siblings.

{¶ 11} Keener testified that A.M. was on track to be reunified with Mother in March or April 2024, and they had begun overnight visits at that time. (Tr. 15.) However, A.M. became aggressive toward Mother after she asked him to complete a simple chore. (Tr. 14-15.) Mother notified Ohio Guidestone of the incident, and A.M.'s therapist called the police to assist Mother. (Tr. 15.) As a result of this incident and other incidents involving A.M. at Ohio Guidestone, the overnight visits were stopped. (Tr. 16.) According to Keener, A.M. threatened Mother and the two younger children, who were present in the home at the time. Following his return to Ohio Guidestone, A.M.'s aggressive behaviors escalated such that he could no longer stay at Ohio Guidestone. His conduct, which included suicidal ideation and threats of sexual violence toward others, made him ineligible for a step down in care. (Tr. 17, 37-38, 40, and 44.) Keener testified that A.M. also hears voices that tell him to do bad things. (Tr. 40.)

{¶ 12} In the three months prior to trial, A.M. had to be physically restrained on multiple occasions because of his aggressive behaviors. (Tr. 38-39 and 42.) As a result, A.M.'s treatment providers at Ohio Guidestone recommended a higher level of care involving a psychiatric placement, but they agreed to keep A.M. in their care until such a placement could be found. (Tr. 17-18 and 26-27.) Keener explained:

> They don't really know what else to do for [A.M.] because he's on his last phase. They have four phases and he has not made progress educationally or behaviorally, so that's why they have recommended a higher level of care at this point.

(Tr. 34.)

{¶ 13} Keener stated that locating a psychiatric placement has been difficult because of A.M.'s young age and the nature of his behaviors. She explained that the agency was seeking permanent custody of A.M. in order to protect him from himself and to protect Mother and Mother's younger children. According to Keener, "He's already tried to hurt all of them[.]" (Tr. 20.)

{¶ 14} A.M.'s lawyer opined to the court that permanent custody was not in A.M.'s best interest and that reunification with his mother would be better for him. However, A.M.'s guardian ad litem ("GAL") stated that he believed permanent custody is in A.M.'s best interest. The GAL stated:

> At this time based upon all the testimony and evidence introduced today I still believe it's in the child best interest that permanent custody be granted.
>
> You know, like I said, he did indicate he wants to go home, but his therapist and other people I interviewed also indicate one day he wants to go home with mom, the next day he doesn't.
>
> What's clear is he needs a raised level of care. He needs to be in the psychiatric facility. He's gotten worse and worse. He has suicidal ideation, sexualized, violent, bullying behavior. He has severe mental illness issues.
>
> They had one-on-one escort with him because he's so bad. I mean, it's just not good, it's not good at all.
>
> I mean, he's becoming a danger to himself and/or others.
>
> I understand mother's love is boundless for this child, but, you know, the fear is if, you know, she would be put in the position where he seems okay for now. Then he goes back in the home and he harms himself, his mother, a baby when she is born.

(Tr. 58-60.)  The GAL further recounted how therapy has not helped A.M., that his psychiatric condition has continued to worsen, and one of his younger siblings has indicated that she is scared of him.  (Tr. 61.)  The GAL acknowledged that Mother loves A.M., but he nevertheless believed permanent custody was in the child's best interest because returning the child to Mother's home could jeopardize the stability of the home where Mother's other children are living.  (Tr. 61.)

{¶ 15} The magistrate who presided over the trial issued a decision recommending that A.M. be placed in the permanent custody of CCDCFS.  Mother filed timely objections to the magistrate's decision.  The trial court overruled the objections and journalized an entry committing A.M. to the permanent custody of the CCDCFS.  Mother now appeals the trial court's judgment.

## II. Law and Analysis

{¶ 16} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "fundamental liberty interest . . . in the care, custody, and management of [his or her child]."  *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The termination of parental rights is regarded as "'the family law equivalent of the death penalty in a criminal case.'"  *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14.  Thus, parents "'must be afforded every procedural and substantive protection the law allows.'"  *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 17} Nevertheless, a parent's right to the care and custody of his or her child is not absolute. *In re L.G.*, 2022-Ohio-529, ¶ 49 (8th Dist.). "'[T]he natural rights of a parent . . . are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 18} All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.*, 2013-Ohio-1704, at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). When parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), citing *In re Howard*, 1986 Ohio App. LEXIS 7860, 5 (5th Dist. Aug. 1, 1986).

{¶ 19} Ohio statutes governing child custody and protection "'appropriately reflect the need to balance . . . [the] parents' . . . interest in the custody, care, nurturing, and rearing of their own children, and the State's parens patriae interest in providing for the security and welfare of children under its jurisdiction[.]'" *In re P.S.*, 2023-Ohio-144, ¶ 26 (8th Dist.), quoting *In re Thompson*, 2001 Ohio App. LEXIS 1890 (10th Dist. Apr. 26, 2001).

## A. Standard of Review

{¶ 20} In the first assignment of error, Mother argues the trial court's judgment is unsupported by sufficient evidence. In the second assignment of error,

she contends the trial court's judgment is against the manifest weight of the evidence. We discuss these assigned errors together because they are interrelated.

{¶ 21} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). The first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this State or another State. R.C. 2151.414(B)(1)(a)-(e).

{¶ 22} "Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 2021-Ohio-3821, ¶ 27 (8th Dist.), citing *In re L.W.*, 2017-Ohio-657, ¶ 28 (8th Dist.).

{¶ 23} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then consider the factors listed in

R.C. 2151.414(D) to determine, by clear and convincing evidence, whether it is in the child's best interest to grant permanent custody to the agency pursuant to R.C. 2151.414(D). *In re H.G.*, 2024-Ohio-3408, ¶ 16 (8th Dist.).

{¶ 24} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.*, 2014-Ohio-2051, ¶ 28 (8th Dist.), quoting *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶ 25} In *In re Z.C.*, 2023-Ohio-4703, the Ohio Supreme Court explained the standard of review appellate courts must apply when reviewing a trial court's application of the clear-and-convincing evidence burden of proof as follows:

> "Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof."

*Id.* at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990), citing *Ford v. Osborne*, 45 Ohio St. 1 (1887), paragraph two of the syllabus.

{¶ 26} Given that R.C. 2151.414 requires a juvenile court to find by clear and convincing evidence that the statutory requirements are met, the Ohio Supreme Court explained that "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties." *Id.* at ¶ 11.

{¶ 27} "Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are 'both quantitatively and qualitatively different.'" *Eastley*

*v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. Sufficiency review involves a determination as to whether the agency met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.); *In re Z.C.* at ¶ 17. Under sufficiency review, a reviewing court should affirm a trial court judgment when the evidence, if believed, is legally sufficient to support the verdict as a matter of law. *In re C.W.*, 2025-Ohio-282, ¶ 37 (10th Dist.), citing *In re Z.C.* at ¶ 13, citing *Thompkins* at 386.

{¶ 28} In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence." *Thompkins* at 387. While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, . . . weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386-387. With respect to the manifest-weight-of-the-evidence standard of review, the Ohio Supreme Court held in *In re Z.C.*:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley*, 2012-Ohio-2179] at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is

consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 14.

{¶ 29} Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re P.S.*, 2023-Ohio-144, ¶ 30 (8th Dist.), citing *In re C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.).

### B. First Prong — R.C. 2151.414(B)

{¶ 30} With respect to the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that A.M could not be placed with either parent within a reasonable time or should not be placed with either of his parents. The record shows that A.M. was not abandoned or orphaned because his mother actively worked on her case plan and visited with A.M. regularly. However, the record further shows A.M. could not be placed with either parent within a reasonable period of time because A.M.'s alleged father is currently incarcerated and will remain incarcerated until the year 2048 and A.M. cannot be placed with Mother because he continues to exhibit dangerous behaviors that threaten the safety of Mother and her younger children. (Tr. 33-34 and 40.)

{¶ 31} Keener testified that A.M.'s therapist did not think that Mother could handle his behaviors. (Tr. 40.) A.M. was removed from his foster family because he needed a higher level of care than a foster family could provide. And, Ohio

Guidestone, a mental-health institution, indicated that it could not meet all of A.M.'s needs and that A.M. needs to be placed in a psychiatric-treatment facility because he is a danger to himself and others. (Tr. 40.) Therefore, the trial court's finding under R.C. 2151.414(B)(1)(a) that A.M. could not be placed with either parent within a reasonable time is supported by the manifest weight of the evidence.

{¶ 32} Though not required to do so in light of its finding under R.C. 2151.414(B)(1)(a), the trial court also found, pursuant to R.C. 2151.414(B)(1)(d), that A.M. has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period. When assessing the length of time during which a child has been in agency custody, R.C. 2151.414(B)(1)(e) provides that "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." In addition, when calculating whether a child has been in an agency's temporary custody for the requisite time, "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d)." *In re C.W.*, 2004-Ohio-6411, ¶ 26.

{¶ 33} The juvenile court placed A.M. in emergency custody of CCDCFS on January 4, 2022. Therefore, A.M. was considered to have entered temporary custody 60 days later, which was March 5, 2023, because he was not adjudicated neglected and dependent under R.C. 2151.28 until April 4, 2023. CCDCFS filed a

motion to terminate temporary custody and for permanent custody of A.M. on December 1, 2023. At that time, A.M. had been in uninterrupted agency custody for nearly 21 months. Although R.C. 2151.414(B)(1)(d) requires 12 or more months of temporary custody within a 22-month period, "[n]othing in R.C. 2151.414(B)(1)(d) requires 22 months of agency involvement before the agency seeks permanent custody." *In re N.M.P.*, 2020-Oho-1458, ¶ 22. Therefore, the juvenile court's finding that A.M. had been in agency custody for 12 or more months of a 22-month period was supported by the manifest weight of the evidence.

{¶ 34} The juvenile court found that A.M. could not be placed with either parent within a reasonable time under R.C. 2151.414(B)(1)(a) and that A.M. had been in agency custody for 12 or more months of a 22-month period. Therefore, the first prong of the permanent-custody analysis was established by the manifest weight of the evidence. And, as previously stated, "Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 2021-Ohio-3821, at ¶ 27, citing *In re L.W.*, 2017-Ohio-657, at ¶ 28. Therefore, the trial court's finding under R.C. 2151.414(B)(1)(a) was sufficient to satisfy the first prong of the permanent-custody analysis.

### 2. Second Prong — Best Interest of the Child

{¶ 35} Having determined that the juvenile court's finding that A.M. could not or should not be returned to either parent within a reasonable time, we now turn to the second prong of our analysis which requires us to determine, by clear and

convincing evidence, whether the order granting permanent custody of A.M. to the agency pursuant to R.C. 2151.414(D) is in the child's best interest.

{¶ 36} In determining the best interest of the child, a juvenile court may apply one of two different tests set forth in R.C. 2151.414(D)(1) and (D)(2). *In re A.F.*, 2023-Ohio-4423, ¶ 41 (8th Dist.), citing *In re S.C.*, 2022-Ohio-356, ¶ 38 (10th Dist.), quoting *In re J.P.*, 2019-Ohio-1619, ¶ 39 (10th Dist.). In this case, the court found that permanent custody was in A.M.'s best interest under R.C. 2151.414(D)(1).

{¶ 37} In determining the best interest of the child under R.C. 2151.414(D)(1), the juvenile court must consider all relevant factors, including but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents, and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶ 38} Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent-custody determination, "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.*, 2020-Ohio-5102, ¶ 31. "Consideration is all the statute requires." *Id.*

{¶ 39} In analyzing the best-interest factors listed in R.C. 2151.414(D)(1)(a), "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Moreover, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re S.C.*, 2015-Ohio-2410, ¶ 30 (8th Dist.).

{¶ 40} In this case, the court expressly considered A.M.'s interaction and interrelationship with his parents and siblings, A.M.'s wishes, A.M.'s custodial history, the GAL's recommendation, and A.M.'s need for a legally secure permanent placement and concluded that permanent custody was in A.M.'s best interest. Regarding A.M.'s interrelationship with family members, the record is clear that he loves Mother and Mother loves him. Keener testified that A.M. is bonded to both Mother and his siblings. (Tr. 23 and 25.)

{¶ 41} However, there was also evidence that A.M. lashed out and struck his younger siblings and that his violent behavior caused him to be separated from his siblings. (Tr. 36.) Keener stated: "He's already tried to hurt all of them." (Tr. 19-20.) Keener added that A.M.'s behaviors are "violent," that "[h]e can be a danger to himself and to others," and that by the time of trial, his behaviors had "gotten worse." (Tr. 37-38 and 41.) A.M. also engaged in sexualized behaviors, and he hears voices that tell him to do bad things. (Tr. 40.) According to Keener, the adults in A.M.'s life have had trouble getting him under control. (Tr. 39.) As previously stated, professionals at Ohio Guidestone indicated that A.M. needs a higher level of care than they can provide and that he needs to be placed in a psychiatric facility.

A.M.'s therapist indicated she does not believe Mother can handle his behaviors. (Tr. 17, 40, and 42.) The manifest weight of the evidence supports the finding that A.M. is a danger to Mother and to his younger siblings. Therefore, despite the genuine love Mother has demonstrated for A.M., this factor weighs in favor of permanent custody since the evidence unequivocally shows that permanent custody is necessary to keep Mother and her other children safe. And because Mother cannot control A.M., the manifest weight of the evidence shows that permanent custody is also necessary to keep to A.M. safe.

{¶ 42} A.M. expressed a desire to return to Mother's custody. However, his wishes were not consistent, and he sometimes indicated that he did not want to be returned to Mother. (Tr. 33.) R.C. 2151.414(D)(1)(b) authorizes the GAL to express a child's wishes on his or her behalf, and the GAL in this case stated he believed that permanent custody is in A.M.'s best interest. The GAL believed that reunification was not even likely "down the road" because A.M.'s younger sister is "scared of him" and the thought of returning A.M. to the home could jeopardize the stability of the home and the children living there. (Tr. 60-61.) Therefore, this factor weighs in favor of permanent custody.

{¶ 43} The factor listed in R.C. 2151.414(D)(1)(c) deals with the child's custodial history, including whether the child has been in temporary custody for at least 12 months of a consecutive 22-month period. In this case, A.M. was removed from A.J.'s home on January 2, 2022, and he remained in agency custody until the time of trial on October 2, 2024. Therefore, the child was in uninterrupted agency

custody for nearly three years at the time of trial and had not been in Mother's care since 2015. (Jan. 3, 2022, tr. 8.) In other words, at the time of trial, A.M. had been out of Mother's custody for nearly nine years, almost A.M.'s entire life. Therefore, this factor weighs in favor of permanent custody.

{¶ 44} R.C. 2151.414(D)(1)(d) requires the court to consider the child's need for a legally secure placement and whether a legally secure placement can be achieved without a grant of permanent custody. The trial court found that a "[l]egally secure placement cannot be made without an order of permanent custody." In making this finding, the trial court found that A.M. "cannot be safely reunified with [Mother] as the child's interactions with [Mother] and family are dangerous due to his aggressive behavior."

{¶ 45} This is an unusual case where the Mother clearly loves her child and has complied with her case plan but the court nevertheless found that her child could not be returned to her. In *In re Higby*, 81 Ohio App.3d 466 (9th Dist. 1992), the court held that a child could not be returned to her father even though the father was a fit parent because he was still unable to meet the specific needs of the child. *Id*. at 471. The *Higby* Court concluded:

> While Douglas presented evidence that he had fully complied with CSB's case plan, we find that the evidence supports the court's conclusion that Douglas is not a suitable parent to take custody of Amanda. It was therefore in Amanda's best interest to terminate Douglas's parental rights in looking towards Amanda's adoption.

*Id*. Mother concedes that "[a] finding that it would not be safe for A.M.'s siblings to have A.M. in the home is likely supported by this record." (Appellant's brief p. 16.)

She argues, however, that Mother would continue A.M.'s treatment in the hospital. However, Mother has already been given two extensions of temporary custody, and A.M. has been in agency custody for well over two years. R.C. 2151.415(D)(4) states:

> No court shall grant an agency more than two extensions of temporary custody pursuant to division (D) of this section and the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section.

Therefore, temporary custody could not be extended any longer. And because A.M. could not be placed with Mother, and no other relatives were willing or able to take legal custody of A.M., the trial court had no choice but to conclude that permanent custody was in A.M.'s best interest.

{¶ 46} Mother nevertheless argues that she had nothing to do with A.M.'s removal, which resulted from the murder of his legal custodian. Although the custodian's death was the impetus for A.M.'s removal in January 2022, A.M. was previously removed from Mother's care in 2016, because of Mother's domestic violence, child endangering, unstable mental health, and lack of stable housing. (Mar. 31, 2022, tr. 8 and 15-16.) And, Mother had no contact with A.M. for "a couple of years" while he was living with his legal custodian. (Mar. 31, 2022, tr. 13.) Moreover, Mother agreed that A.M. should remain in temporary custody in June 2023, while she continued to work on her case plan. (June 14, 2023, tr. 5.) Therefore, despite Mother's argument to the contrary, Mother's own actions

contributed to his placement in agency custody in addition to the death of A.M.'s legal custodian.

{¶ 47} Mother also argues the trial court erred in finding that she failed to remedy the conditions that led to A.M.'s removal. Indeed, Mother was reunited with her other children and she completed all aspects of her case at the time of trial except for the results of her drug screening. However, the best-interest-of-the-child analysis was markedly different with respect to A.M. compared to that of the other children, who did not exhibit the same level of violence and aggression that A.M. showed to himself and others. The Ohio Supreme Court has held that courts must consider the best interest of each child individually, and what might be one child's best interest is not necessarily in the best interest of another child. In *In re William S.*, 75 Ohio St.3d 95 (1996), the Court explained:

> "Assuming for the sake of argument only, that evidence exists that appellant is incapable of coping with all four children together or the two oldest boys who may have severe learning disorders or behavioral problems, this should not serve to cause the removal of all four children from the natural mother. The worst accusations that have been made against appellant are that she is simply unable to cope with the special needs of her two oldest children, and that she is 'overwhelmed' with the responsibility of rearing all four children together. Judicial reaction to these accusations should be no greater than warranted, and judicial response should be the least intrusive that is available. Each child at issue here is an individual and should be treated as an individual."

*Id.* at 101, quoting *In re William S.*, 1994 Ohio App. LEXIS 3809, * 24 (6th Dist. Sept. 1, 1994). "What is appropriate for one child is not necessarily the best arrangement for a sibling." *In re Palmer*, 2006-Ohio-4747, ¶ 15 (5th Dist.). Just

because Mother was reunited with A.M.'s siblings does not mean that reuniting A.M. with Mother is in A.M.'s best interest.

{¶ 48} The manifest weight of the evidence, which necessarily includes sufficient evidence, supports the trial court's conclusions that A.M. could not be placed with either parent within a reasonable time, that A.M. had been in uninterrupted agency custody for over 12 months, and that permanent custody was in A.M.'s best interest. We, therefore, overrule the first and second assignments of error.

{¶ 49} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
DEENA R. CALABRESE, J., CONCUR